UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHIRLEY BISHOP<br>　　　　Plaintiff,<br>　v.<br><br>NORTHEAST UTILITIES SYSTEM COMPANY;<br><br>LIBERTY LIFE ASSURANCE COMPANY OF BOSTON;<br><br>THE HARTFORD INSURANCE COMPANY<br>　　　　Defendants,<br><br>RONALD F. CERUTI, ADMINISTRATOR OF THE ESTATE OF GARY J. CERUTI, AND RONALD F. CERUTI AND ROBIN SIMCKAK, NEXT OF KIN OF GARY J. CERUTI<br>　　　　Defendants-Intervenors | :<br>:<br>:<br>:<br>: CIV. NO. 3:01CV 1434 (CFD)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: MAY 25, 2004 |

## MOTION IN LIMINE TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT, ELIZABETH J. MCMAHON

The defendant-intervenors, Ronald F. Ceruti, Administrator of the Estate of Gary J. Ceruti, and Ronald F. Ceruti and Robin Simckak, Next of Kin of Gary J. Ceruti, respectfully move in limine for an order barring plaintiff from introducing the testimony, reports, and/or opinion of proposed expert, Elizabeth J. McMahon, Esq. The testimony should be barred because it does

not constitute "expert" opinion under Rule 702 of the Federal Rules of Evidence. The proposed expert testimony improperly seeks to divine the intent of plaintiff and decedent Gary Ceruti when they entered into their divorce agreement. Further, the testimony usurps that which is within the exclusive province of the Court: to make findings of fact and render conclusions of law. For these reasons, set forth more fully below, the defendant intervenors move in limine for an order precluding the proposed expert testimony of Attorney Elizabeth McMahon.

> A. <u>Attorney McMahon's proposed testimony does not constitute "expert" opinion under Rule 702 in that it consists of conclusions of fact and law and therefore usurps the Court's role.</u>

Rule 702 of the Federal Rules of Evidence defines those circumstances under which expert testimony may be offered: The rule reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Federal Rules of Evidence, 702.

The role of an expert "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"); U.S. v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991).

According to plaintiff's March 19, 2002 Disclosure of an Expert Witness ("Disclosure"), Attorney McMahon, a Connecticut attorney who has prepared QUADRO's as part of her professional practice, is being offered as an expert witness to testify as to the "usage and meaning of terms" employed in the September 3, 1996 Divorce Judgment, and four Agreements dated August 8, 1996, August 8, 1996, August 21, 1996 and August 21, 1996.  See Disclosure, 1(a).  According to the Disclosure, Attorney McMahon is expected to testify that "[n]o terms or usage of language in the divorce agreements between Shirley Ceruti/Bishop and Gary Ceruti makes any reference to Shirley Ceruti/Bishop waiving or relinquishing any right to be named as a beneficiary or in any way

limiting Gary Ceruti's right to select or continue to select any beneficiary." See attached March 19, 2002 Disclosure, 2(b).

Attorney McMahon's proposed testimony essentially amounts to the conclusion that decedent Gary J. Ceruti and the plaintiff did not intend to waive claims to each other's retirement and employment benefits, and that Gary Ceruti did not intend to change the plaintiff's status as a beneficiary in the case of death. Attorney McMahon concludes that the plaintiff did not waive or relinquish her right to be named as beneficiary, and decedent Gary J. Ceruti was not barred from changing the name of the beneficiary in the divorce settlement. However, this opinion is actually a conclusion of fact and usurps the role of the ultimate fact-finder. The role of an expert "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"); U.S. v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991). Attorney McMahon's claims that decedent Gary J. Ceruti

and Plaintiff actually did not intend to waive their rights with respect to death benefits is a conclusion of a material fact that ought to be reserved to a finder of fact.

Furthermore, Attorney McMahon's expert testimony preempts the role of the judge by attempting to offer her legal conclusions. See, e.g., Marx & Co. v. Diner's Club, 550 F.2d 505, 508 (2d Cir. 1977) (invalidating expert witness's testimony as to the legal obligations of parties under a contract). Expert testimony on issues of law is generally inadmissible. See United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991). In Marx & Co., the securities expert inappropriately noted that "best efforts obligations" required a party to pursue a registration statement. The Second Circuit struck down this testimony because it "did not concern practices in the securities business, on which Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue. It was testimony outside his area of expertise." 550 F.2d at 509. "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." 550 F.2d at 509 (internal citation omitted).

Attorney McMahon's testimony here usurps the role of the Court. She reads the divorce settlement between decedent Gary J. Ceruti and the plaintiff, which contains explicit property, pension and retirement account waivers, and draws conclusions as to parties' legal obligations in this case. See Plaintiff's Disclosure of Expert Witness (stating that the divorce settlement waiver "meant that each party was free to do with his/her retirement benefits as he/she wishes, without interference or claim by the other...").

Attorney McMahon's testimony is not limited to the area of her expertise—the definition of terms of the nature of QUADRO's, for example. Instead, she is being offered specifically to comment on the intent of the parties and the legal obligations arising from the divorce settlement between Gary Ceruti and the plaintiff in 1996. Where, as here, the proposed expert's testimony would infringe upon the judge's role in his legal conclusions, the Courts will not tolerate this and should not accept the expert testimony. Marx & Co.,supra, 550 F.2d at 512.

### B. The proposed expert testimony improperly looks to testify as to the intent of the parties.

Plaintiff relies on lawyer Elizabeth McMahon's expert opinion in an improper attempt to interpret the divorce agreement between Plaintiff and decedent Gary J. Ceruti. Based on her experiences with a number of past divorces, Attorney McMahon seeks to divine now what the plaintiff and decedent Gary J. Ceruti intended with respect to death benefits when they settled on the divorce agreement in 1996. See Disclosure. However, intent in this case is a question of fact, and Plaintiff's use of an expert witness to establish the intent of the parties is outside the proper scope of expert testimony because it does not assist the trier of fact in any way, and because it subverts the Court's role as a finder of fact and the judge's role to interpret the law.

The proposed testimony also fails for lack of foundation. Attorney McMahon does not indicate that she at any time interviewed or even spoke with the plaintiff, the decedent, their counsel, anyone who knew any of them, or anyone who knew anything about their divorce. Thus, the expert testimony she will purportedly offer as to the actions or intent of the parties, necessarily

lacks personal knowledge, the absence of which is fatal here. Nora Bevs., Inc. v. Perrier Group of Am. Inc., 164 F.3d 736, 746 (2d Cir. 1998); Stepak v. Aetna Life & Cas. Co., 1994 U.S. Dist. LEXIS 15559, at *63 (D.Conn. Aug. 26, 1994) (Covello, J.) (copy attached). It is inconceivable that any expert—even a self-proclaimed divorce expert as Attorney McMahon purports to be—could opine about the intent about parties to Agreements that comprise and Judgment of Divorce. Indeed, in the criminal arena, experts are statutorily barred from giving such opinions. See Conn. Gen. Stat. § 54-86i. Courts have regularly excluded such experts lacking personal knowledge of specific agreements because such testimony may "mislead rather than assist the trier of fact." Nora Bevs., Inc. v. Perrier Group of Am. Inc., 164 F.3d 736, 746 (2d Cir. 1998). Attorney McMahon, no matter what her expertise, quite obviously does not—and cannot—have personal knowledge of what the plaintiff and Gary Ceruti intended when they entered into the Agreements that comprise the Judgment of Divorce. Id.

In a similar vein, Attorney McMahon's "expert" testimony is not admissible under FED. R. EVID. 702 for lack of "sufficient facts or data." Under no circumstances is Attorney McMahon's "expert testimony" admissible:

her attempt to form a strict per se rule in divining intent from a specific divorce agreement, combined with the utter failure to garner "sufficient facts or data" in accordance with FED.R.EVID. 702 is essentially a factual and legal conclusion that misleads, rather than enlightens, the finder of fact. <u>Nora Bevs., Inc. v. Perrier Group of Am. Inc.</u>, 164 F.3d 736, 746 (2d Cir. 1998).

Attorney McMahon's claims that decedent Gary J. Ceruti and Plaintiff actually did not intend to waive their rights with respect to death benefits is a conclusion of a material fact that ought to be reserved to a finder of fact.

WHEREFORE, the Defendants-Intervenors respectfully move for an order in limine, barring the plaintiff from introducing the testimony, opinion or

reports of Elizabeth J. McMahon.[1]

DATED:   May 25, 2004

RESPECTFULLY SUBMITTED,

_____
Kevin C. Shea (#ct13781)
Clendenen & Shea, LLC
P.O. Box 301
New Haven, Connecticut 06502
Telephone:  (203) 787-1183
Facsimile:   (203) 787-2847
E-mail:       office@clenlaw.com

CERTIFICATION:

to:   This is to certify that a copy of the foregoing was mailed postage prepaid

Bruce A. Chaplin, Esq.
208 Main Street
Durham, CT  06422

Alicia Davenport, Esq.
Northeast Utility Systems
107 Selden Street
Berlin, CT  06037

_____

---

[1] Prior to filing this motion, the defendant-intervenors sought possible dates when Ms. McMahon could be deposed. Plaintiff has not provided any dates. The defendant intervenors have therefore noticed the deposition of Attorney McMahon for June 23, 2004, and accordingly reserve their right to supplement this motion based on her deposition testimony

Duncan Ross Mackay, Esq.
Northeast Utility System
Legal Dept.
PO Box 270
Hartford, CT  06141

on the 25th day of May, 2004.

_____
CLENDENEN & SHEA, LLC

FOCUS - 3 of 7 DOCUMENTS

**BARNETT STEPAK v. AETNA LIFE AND CASUALTY COMPANY, et al.**

Civ. No. H:90CV00886 (AVC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*1994 U.S. Dist. LEXIS 15559*

**August 26, 1994, Decided**

**August 29, 1994, Filed**

**JUDGES:**
[*1] Covello

**OPINIONBY:**
ALFRED V. COVELLO

**OPINION:**

RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a class action for securities fraud brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j* ("the Act"), and Securities Exchange Commission Rule 10b-5, *17 C.F.R. § 240.10b-5*, in which the plaintiff alleges that the defendant, Aetna Life and Casualty Company ("Aetna") made false and misleading statements and omissions in connection with the sale of its stock. Aetna now moves for summary judgment, asserting that the plaintiff has failed to present sufficient evidence of a material misleading statement or omission by Aetna, and that Aetna is entitled to judgment as a matter of law. The issues presented are: 1) whether information concerning Aetna's real estate holdings, problem mortgage loans, and restructured loans was made available to the public, thereby precluding the plaintiff's fraud-on-the-market claim based on these alleged nondisclosures; 2) whether the evidence concerning Aetna's real estate appraisal and valuation procedures supports the plaintiff's claim for securities fraud; 3) whether Aetna's failure to disclose in its [*2] annual reports the amortization terms of its mortgage loans constitutes a securities law violation; 4) whether the evidence concerning Aetna's determination of loan loss reserves supports the plaintiff's claim for securities fraud; 5) whether there is a genuine issue of disputed fact as to Aetna's violation of Generally Accepted Accounting Principles; and 6) whether the plaintiff is entitled to an adverse inference arising from the defendant's destruction of evidence, and whether such inference, if any, creates a dispute of material fact. For the reasons contained herein, the court concludes that no genuine issue of material fact exists as to whether Aetna violated Section 10(b) and Rule 10b-5, and, therefore, grants Aetna's motion for summary judgment on these counts. Further, the court dismisses the plaintiff's claims brought pursuant to Section 20 of the Act. The court also dismisses the plaintiff's state law claims for lack of subject matter jurisdiction.

FACTS

On February 13, 1990, the plaintiff bought 25 shares of Aetna common stock. On October 22, 1990, the plaintiff filed this action for securities fraud against Aetna and its present and immediate past executive officers, [*3] alleging that Aetna made material false and misleading statements or omissions in connection with the sale of securities. On December 12, 1991, pursuant to a stipulation between the parties, the court conditionally certified the plaintiff as the representative for a class of purchasers of Aetna stock between February 16, 1989 and November 13, 1990.

On August 26, 1991, the court denied the defendant's motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) for failure to state a claim. On April 8, 1994, after three extensions of time in which to complete discovery, the period for discovery closed.

The pleadings, affidavits, and exhibits attached thereto disclose the following uncontroverted facts. n1

Case 3:01-cv-01434-CFD    Document 116    Filed 05/25/2004    Page 13 of 15

Page 2
1994 U.S. Dist. LEXIS 15559, *

n1 The plaintiff has asserted ten issues of material fact that he claims preclude summary judgment for the defendant. The court presents the facts which are relevant to those ten issues. To the extent that certain facts are not relevant to the remaining issues enumerated by the plaintiff, they are not discussed herein.

[*4]

Aetna's Public Disclosures n2

n2 The court's statement of facts includes those public disclosures upon which plaintiff relies as the source of his claim for securities fraud, as well as further public disclosures relevant to the analysis of the plaintiff's allegations. It does not include a synopsis of all of Aetna's public disclosures from 1988 through 1991.

Aetna is a publicly held corporation with assets of roughly $ 87.1 billion n3 which provides insurance and financial services to corporations, public and private institutions, and individuals. In 1988, mortgage loans and real estate investments constituted approximately 39% of Aetna's entire investment portfolio. n4 In its 1988 and 1989 annual reports to shareholders, as well as its 1988 and 1989 annual report Forms 10-K filed with the Securities and Exchange Commission ("SEC"), n5 Aetna made representations concerning its mortgage loan and real estate investments. In its 1988 and 1989 10-K statements, Aetna stated:

The majority of general account [*5] assets attributable to group and individual life, health, and pension operations has been invested primarily in long-term, fixed-income obligations such as corporate debt securities and mortgage loans. The investment program emphasizes maintenance of portfolio quality while achieving competitive investment yields.

.... The maturing of liabilities is continuously monitored and the supporting investment portfolio is periodically adjusted, as necessary, with the object of maintaining balance in relation with these obligations.

1989 Form 10-K, at 16; 1988 Form 10-K, at 19 (nearly identical language). In the discussion of "Capital Resources and Liquidity" in Aetna's 1988 annual report to shareholders, Aetna stated: "The company continually monitors its investment portfolios with the objective of making adequate provision for potential investment losses." 1988 Annual Report, at 28. Aetna further stated that its "allowance for potential investment losses" was $ 326 million at the end of 1988, as compared to $ 487 million in 1987 and $ 510 million at the end of 1986. Id.

n3 Aetna's 1989 Annual Report to Shareholders, at 1. [*6]

n4 Aetna's Form 10-K for the fiscal year ending December 31, 1988, filed with the SEC.

n5 Pursuant to Section 13 of the Securities Exchange Act of 1934, "Periodical and other reports," every issuer of a registered security must file with the SEC within 90 days after the end of the fiscal year a Form 10-K, Annual Report pursuant to § 13 or § 15(d) of the Act.

In its 1989 annual report to shareholders, Aetna discussed the composition of its mortgage loan investments, and stated, "The vast majority of mortgage commitments are for existing, well-leased commercial real estate." 1989 Annual Report, at 29. Aetna stated that its "allowances for potential investment losses for mortgage loans" were $ 49 million for 1989, $ 64 million in 1988, and $ 72 million in 1987; as compared to its actual mortgage losses incurred, which were $ 45 million in 1989, $ 65 million in 1988, and $ 46 million in 1987. Id. Concerning a general downturn in the real estate market, Aetna stated: "Mortgage loan delinquencies have recently been adversely affected by general economic conditions and overbuilding in some [*7] real estate markets." Id. Aetna then stated: "Management does not anticipate significant deterioration in general economic conditions or in the sectors of the real estate markets in which the company invests and, therefore, does not expect a significant increase in mortgage loan losses." Id.

In addition to these statements in annual reports to the SEC and shareholders concerning Aetna's real estate investment portfolio, Aetna also filed detailed annual financial statements with the Connecticut Insurance Department ("CID"), as required by Connecticut law. In contrast to both the Form 10-K filed with the SEC and the annual reports to shareholders, which were required to comply with Generally Accepted Accounting Principles ("GAAP"), Aetna's annual financial statements to the CID were required to comply with financial reporting standards known as Statutory Accounting Practices ("SAP") n6 Due to the differences between GAAP and SAP, Aetna's financial statements filed with the CID included details concerning Aetna's investment portfolio that were not included in their

Case 3:01-cv-01434-CFD    Document 116    Filed 05/25/2004    Page 14 of 15

Page 3
1994 U.S. Dist. LEXIS 15559, *

GAAP annual reports. The annual financial statements filed by Aetna Life Insurance Company, Aetna's principle insurance [*8] affiliate and the holder of most of Aetna's mortgage loans and real estate, included schedules showing the following: (1) each real property owned by the company (or sold during the previous year) with a value in excess of $ 100,000, including an indication of those which were obtained through foreclosure; (2) each performing mortgage with a principle amount of $ 1,000,000 or more; (3) each mortgage loan for more than $ 100,000, which was overdue for more than three months; (4) each mortgage on a property in the process of foreclosure or voluntary conveyance to the company; (5) each mortgage transferred to real estate during the year as a result of foreclosure or voluntary conveyance; and (6) each other long-term asset owned by the company. Pursuant to Connecticut law, C.G.S. § 38a-53, n7 the annual and quarterly statements filed by all insurance companies with the CID, including those of Aetna, were public records, available to the public for inspection. Further, Aetna provided copies of these annual financial statements by mail to at least 250 rating agencies, market analysts, institutional investors, and other market professionals.

n6 The Statutory Accounting Practices are comprised of "Accounting Practices" promulgated by the National Association of Insurance Commissioners (NAIC), by regulations issued by state regulators, by state statutes, and by interpretive material published by the NAIC, and govern financial reporting for insurance regulatory purposes. [*9]

n7 C.G.S. § 38a-53 provides, in pertinent part: "(a) Each insurance company ... shall, annually ... render to the commissioner a true report ... of its financial condition ...."

In addition to the state and federal filings, Aetna disclosed further information concerning its real estate investments and mortgage loan portfolio to market professionals. During the class period, Aetna provided information to market analysts concerning problem loans, foreclosures, and restructured loans. The market professionals published this information in their reports on Aetna, which routinely included detailed information concerning problem loans, restructured loans, foreclosures, and Aetna's investment portfolio generally. n8

n8 See Appendix to Aetna's motion for summary judgment, vol. IV (including 17 reports during 1989 and 1990 by rating agencies and analysts which include discussion of Aetna's investment portfolio, including the status of mortgage loan portfolio).

[*10]

On October 10, 1990 Reuters quoted an Aetna spokesperson as stating, "Aetna's mortgage portfolio has consistently been underwritten on a conservative basis."

Aetna's Practices concerning Reserves and Real estate valuations n9

n9 Because the complaint alleges that certain internal policies of Aetna were inappropriate, and that Aetna's failure to disclose such policies to the market artificially inflated the price of Aetna stock, the court describes the relevant facts concerning Aetna's internal policies. Because the plaintiff has abandoned numerous factual allegations in his complaint, this statement of facts concerns only those policies relevant to the plaintiff's enumerated "issues" of fact, rather than including a synopsis of all of Aetna's operating policies and procedures.

These facts are derived from Aetna's public filings and the affidavits of Aetna officers, which the plaintiff has not controverted.

The affidavits submitted in support of Aetna's motion for summary judgment disclose the following uncontroverted [*11] facts concerning certain internal policies and practices of Aetna which are the subject of the plaintiff's complaint.

*Appraisals*

At the time that Aetna originated a commercial mortgage loan, it received an appraisal of the subject property. The appraisal was either: 1) made by the mortgage banking "correspondent" that recommended the loan to Aetna, or by a third party appraiser instructed by the correspondent to conduct the appraisal; or 2) made by a third party appraiser if the loan was not originated through a correspondent. Correspondents received a commission from the borrower when Aetna approved a loan. Aetna also conducted its own valuation as part of its underwriting process, prior to making a loan. In its public disclosures, Aetna did not disclose the source of

the appraisals of the properties which underlie Aetna's mortgage loans.

When valuing commercial real estate in its investment portfolio, Aetna utilized the "discounted cash flow" method, an approved technique for appraisal of real estate by inside or outside appraisers. In its public disclosures, Aetna did not disclose that it utilized the "discounted cash flow" method of valuing its commercial properties.

*Monitoring* [*12] *Portfolio and Establishing Reserves*

At the end of each fiscal quarter, Aetna evaluated those mortgage loans in its portfolio that had been restructured or that had met its definition of "problem loans." Problem loans included: (1) loans more than sixty days in delinquency; (2) certain loans to borrowers in bankruptcy; (3) loans on properties in the process of foreclosure; and (4) loans on properties that had been foreclosed, but were subject to statutory rights of redemption. If an evaluation of a restructured or problem loan disclosed that it was probable that the value of a particular loan was impaired, a specific reserve was established in the amount of the estimated impairment, i.e., the difference between the principal balance of the loan and the estimated fair value of the collateral. The amount of the specific reserve was based on a valuation using the "discounted cash flow" method. Aetna added to the specific reserve for a given loan in subsequent periods if Aetna determined that further impairment was probable. Specific reserves were created by deductions from Aetna's current income. Pursuant to GAAP, Aetna accounted for specific loan loss reserves as realized capital losses [*13] and included them in the amount shown for realized capital gains and losses in Aetna's results of operation in Aetna's quarterly and annual reports.

In addition to specific reserves based on Aetna's periodic assessments of individual mortgage loans, Aetna maintained a general reserve, designed to recognize impairment not yet identifiable to a particular loan or loans. Aetna based its general reserve on a formula. The formula attempted to predict the amount of general reserve which would be necessary to match losses in value experienced by the company historically in its mortgage portfolio.

The amount of loss reserves, both general and specific, was accounted for in Aetna's GAAP financial statements. The value of the investments shown in Aetna's quarterly and annual GAAP consolidated balance sheets were reduced by the amounts of specific and general reserves. Note 1 to the financial statements in Aetna's annual reports to shareholders, entitled "Summary of Significant Accounting Policies" stated,

"an allowance for investment losses is deducted from investment carrying values, and the current provision is included in realized capital gains and losses." In its 1988 annual report, Aetna [*14] disclosed its "allowance for potential investment losses," which referred to all investments, rather than a reserve distinctly for mortgage loan investments. n10 In its 1989 annual report Aetna specifically disclosed its allowances for potential losses attributable to mortgage loans. Aetna did not disclose in its public disclosures its specific formulae for determining specific loss reserves or general loss reserves.

n10  Aetna's allowance for potential investment losses was $ 326 million in 1988, $ 487 million in 1987, and $ 510 million in 1986.

In its 1990 annual report to shareholders, Aetna stated that its mortgage loan impairment reserves were increased from $ 49 million in 1989 to $ 312 million in 1990.

On September 28, 1990, Aetna chairman James Lynn requested that Daniel Kearney, an officer in Aetna's realty investments department, conduct a study of Aetna's mortgage loan portfolio in order to, among other objectives: (1) "suggest a methodology for estimating the potential loss exposure of the commercial mortgage [*15] loan portfolio"; and (2) "establish a system which will allow [Aetna Realty Investors], on an ongoing basis, to do more sophisticated monitoring of the commercial mortgage loan portfolio." A November 1990 draft of the so-called "Kearney report" used assumptions different from the "historical" formula to calculate potential loss exposure from commercial mortgage loans, and estimated that potential loss exposure could rise to $ 542 million in 1990. This amount included $ 138 million of specific reserves for loans in "problem" or "workout" status. Prior to that time, Aetna had established specific reserves of $ 48 million with respect to those loans. Following the preliminary phase of the Kearney Report, at the end of 1990, Aetna made further additions to both its general and specific reserves.

During the class period, a substantial portion of Aetna's mortgage loan portfolio was composed of five, seven, or ten year loans with little or no amortization. These "bullet" loans require "balloon maturity" payments, i.e., significant principal payments due at maturity. During 1989-1990, approximately $ 1.8 billion of Aetna's "bullet" loans came due. Over one half of these loans were not fully [*16] paid in accordance with