1994 U.S. Dist. LEXIS 15559, *

their terms, and Aetna either restructured or foreclosed upon the loans. In its annual or quarterly reports, Aetna did not describe the loan amortization terms of the mortgage loans in its investment portfolio.

On August 11, 1993, Aetna moved for summary judgment. On May 9, 1994, after the plaintiff's motion for an extension of time to conduct further discovery was granted for the limited purpose of deposing James Richmond, the plaintiff opposed the motion for summary judgment. On May 19, 1994, Aetna filed a reply brief, and on June 8, 1994, the plaintiff filed a surreply.

STANDARD

A motion for summary judgment is granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. F.R.C.P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) [*17] (quoting *Anderson*, 477 U.S. at 248). After discovery, if the non-moving party "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), cert. denied, 116 L. Ed. 2d 117, 112 S. Ct. 152 (1991). See also *Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).

The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, [*18] and identifying those portions" of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The nonmoving party must then present evidence sufficient to support a verdict in its favor as to every element of its claim for which it will carry the burden of proof at trial. *Id.* at 322-23. "If the [nonmoving party's] evidence is ... not sufficiently probative ... summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "Both the Supreme Court and [the Second Circuit] have encouraged the use of summary judgment in complex cases to avoid unnecessary trials." *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011-12 (2d Cir. 1989).

Although materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact, see *Basic, Inc. v. Levinson*, 485 U.S. 224, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988), [*19] summary judgment may be granted in appropriate cases. *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1113 (9th Cir. 1989), cert. denied, *Schneider v. Apple Computer, Inc.*, 496 U.S. 943, 110 L. Ed. 2d 676, 110 S. Ct. 3229 (1990); see *Greenapple v. Detroit Edison Co.*, 618 F.2d 198 (2d Cir. 1980); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949 (2d Cir. 1978); *Ross v. Bank South, N.A.*, 837 F.2d 980, 1003 (11th Cir. 1988).

DISCUSSION

Pursuant to the authority provided by Section 10(b) of the Securities Exchange Act of 1934, n11 the SEC promulgated Rule 10b-5, which makes it unlawful to misrepresent or omit material information in connection with the purchase or sale of securities. *17 C.F.R. § 240.10b-5 (1992)*. n12 In order to prove a claim under Rule 10b-5, the plaintiff must show that, in connection with the purchase or sale of a security, "the defendant, with scienter, made a misrepresentation of material fact or failed to disclose a material fact, and that the plaintiff relied on the misrepresentation [*20] or omission and suffered a loss as a result of the misrepresentation or omission." *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir. 1992), cert. denied, 124 L. Ed. 2d 249, 113 S. Ct. 2338 (1993).

---

n11 Section 10 of the Securities Exchange Act of 1934, *15 U.S.C. § 78j*, provides in pertinent part:

"It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative scheme or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

n12 Rule 10b-5, *17 C.F.R. § 240.10b-5* (1992), provides, in pertinent part:
"Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly ... ,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

[*21]

In its motion for summary judgment, Aetna asserts that it has proven that the majority of the allegations in the complaint are simply false, and that the claims based upon these false premises must be dismissed. As to the plaintiff's remaining allegations of material misrepresentations or omissions, Aetna contends that the claims fail as a matter of law because the plaintiff has failed to produce any evidence or any factual disputes concerning one or more of the essential elements of securities fraud, including: 1) a false statement or omission; 2) materiality; 3) reliance; and 4) scienter.

In his response to Aetna's motion for summary judgment, the plaintiff fails to support, or even attempt to support, numerous specific averments of his complaint. n13 Instead, the plaintiff enumerates ten "factual issues" which he asserts "demonstrate that the disclosures made by Aetna to its shareholders during the class period were materially false and misleading." The plaintiff contends that these facts or disputes of fact support his claim for securities fraud and preclude granting summary judgment to the defendant. The purported issues of material fact are Aetna's:

(i) misrepresentation [*22] of Aetna's real estate holdings;
(ii) nondisclosure of problem mortgage loans;
(iii) failure to disclose restructured loans and "workouts";
(iv) failure to conduct independent appraisals;
(v) failure to value real estate conservatively;
(vi) failure to disclose nonamortizing ("bullet" or "balloon") loans;
(vii) inadequate loan loss reserves prior to 1991;
(viii) failure to set reserves on a reasonable basis;
(ix) violation of Generally Accepted Accounting Principles; and
(x) destruction of documents.

n13 For instance, the complaint alleged: (1) that Aetna conducted no appraisals of the real estate collateralizing its mortgage loans, and that Aetna "did not even reappraise property on which it had foreclosed;" and (2) that Aetna failed to disclose that no charge to a mortgage loan is made when a foreclosure occurs, but rather, mortgage loan losses are only reported when and if the collateral is sold, and that foreclosed mortgage loans "are not disclosed or reflected in any way in Aetna's public filings."

Upon its motion for summary judgment, Aetna presented evidence that Aetna: 1) regularly reappraised its real estate when loans became problem loans or were restructured; 2) reappraised real estate obtained through foreclosure; 3) did not assume the value of real estate collateral would always exceed the mortgage principal balance; 4) reduced the carrying value of its mortgage loans when losses became probable; 5) did not wait to recognize a loss until the sale of foreclosed real estate at an amount less than the principal balance.

In the plaintiff's memoranda opposing summary judgment and exhibits thereto, the plaintiff does not present evidence nor otherwise challenge Aetna's evidence on these issues. Accordingly, the plaintiff has abandoned these allegations of the complaint, and the court grants Aetna's motion for summary judgment on the claims of the complaint on which the plaintiff has failed to present evidence. See *Celotex Corp., 477 U.S. at 323* (upon motion for summary judgment, nonmoving party must present evidence demonstrating a genuine issue of material fact as to each element of its claim).

[*23]

Below, the court examines each asserted factual issue in order to determine whether a genuine issue of material fact exists as to the plaintiff's claim for securities fraud. See *Ferber v. Travelers Corp., 802 F. Supp. 698, 704 (D. Conn. 1992)* ("the court examines the sufficiency of each category of alleged material omissions and misstatements"); See also *In re Apple Computer, 886 F.2d at 1113* (the nonmoving party must "present evidence sufficient to support a verdict in its favor on every element of its claim").

A. Issues (i), (ii), (iii): Applicable Law Regarding Materiality, Reliance and Scienter

Case 3:01-cv-01434-CFD    Document 116-2    Filed 05/25/2004    Page 3 of 17

Page 7
1994 U.S. Dist. LEXIS 15559, *

The plaintiff alleges that in its SEC filings during the class period Aetna: 1) misrepresented Aetna's real estate holdings by failing to disclose the percentage of their properties that were acquired through foreclosure; 2) failed to disclose the amount of its problem mortgage loans; and 3) failed to disclose the number of restructured loans; and that in so doing Aetna omitted material facts from its public disclosures.

In its motion for summary judgment, Aetna asserts that, as a matter of law, these alleged omissions fail [*24] to support the plaintiff's securities fraud claim because the purportedly undisclosed information was otherwise available to the public and credibly entered the market. Aetna asserts that detailed information concerning its problem mortgage loans and its real estate holdings, including how many properties were acquired through foreclosure, was included in Aetna's annual financial statements filed with the Connecticut Insurance Department. Aetna further asserts that information concerning its restructured loans was provided to market professionals, and thereby credibly entered the market. Because the plaintiff relies on a so-called "fraud on the market" theory in this action, and the information was disclosed to the public and the market, Aetna contends that the plaintiff can prove neither materiality nor reliance as to these purported nondisclosures. For the same reasons, Aetna further contends that the plaintiff cannot establish scienter as to these claims.

The plaintiff, in response, concedes that, "as a factual matter, [] careful analysis of Aetna's state filings did provide plaintiff with certain information about problem loans, foreclosed properties, and restructured loans," [*25] but asserts that, "that information is obscure, difficult to find, and difficult to interpret." n14 The plaintiff contends that Aetna cannot cure its failure to disclose this information in its reports to the SEC and shareholders by including the information in "obscure" state filings. The plaintiff also contends that the information was material in that it would prove significant to the reasonable investor, and, in any case, materiality is a question of fact to be determined by the jury.

n14 Plaintiff's memorandum in opposition to summary judgment, at 37-38.

Materiality

Under Section 10(b), information is "material" only if its disclosure would alter the "total mix" of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). The Supreme Court has made clear that [*26] the materiality of an alleged "omitted" fact must be judged in the context of all information available to the market: "There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).

Because an alleged misrepresentation or omission must be examined in light of the information available to the market, no securities law disclosure violation can occur when information allegedly omitted from a corporation's public disclosures is already available to the market. See *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir.)(finding alleged omission of fact immaterial where information had already been disclosed to the market via press releases), cert. denied, 454 U.S. 1092, 70 L. Ed. 2d 631, 102 S. Ct. 658 (1981); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) [*27] ("Although the underlying philosophy of federal securities regulations is that of full disclosure, 'there is no duty to disclose information to one who reasonably should already be aware of it.'"); *Johnson v. Wiggs*, 443 F.2d 803, 806 (5th Cir. 1971) (no duty to disclose information already in the public domain). As the Ninth Circuit stated in *In re Apple Computer Sec. Litig.*, 886 F.2d at 1115: "In a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources." (emphasis provided). n15

n15 See also *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust*, 785 F. Supp. 411, 422 (S.D.N.Y. 1992) (rejecting securities fraud claim based on nondisclosure of market rates); *Warner Communications, Inc. v. Murdoch*, 581 F. Supp. 1482, 1492 (D. Del. 1984) (no duty to disclose "universal" interest of corporate officers and directors in maintaining corporate control by defending against undesired takeover bids).

[*28]

Reliance: Fraud-on-the-Market

Because the plaintiff is unable to allege personal reliance on any Aetna disclosure document, he is proceeding under the "fraud-on-the-market" theory recognized by the Supreme Court in *Basic Inc. v.*

*Levinson*, 485 U.S. at 241-50. In Basic, the Supreme Court stated: "'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.'" *Id. at 241* (quoting *Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986))*. "The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated ... by early fraud cases .... 'The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.'" *Id. at 244* (quoting *In re LTV Securities Litigation, 88 F.R.D. 134, 143 (N.D. Tex. 1980))*; [*29] See also *Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 518 (7th Cir. 1989)* ("No investor absorbs sheafs of dense type .... Descriptions in Forms 10-K and registration statements are almost useless to individual investors. They require absorption by professional traders and investors."); *In re Verifone Sec. Litig., 784 F. Supp. 1471, 1479 (N.D. Cal. 1992)*, aff'd, *11 F.3d 865 (9th Cir. 1993)*. n16

> n16 The fraud-on-the-market theory recognizes that average investors in a developed securities market do not personally need access to the elaborate disclosure of documents and accounting data required by our securities laws. Market professionals obtain information from myriad sources, including the issuer, market analysts, and the financial and trade press. The professional traders analyze information about securities, and the trading activity of these knowledgeable investors pushes the price of the security toward a value which reflects all publicly available information.
>
> *In re Verifone Sec. Litig., 784 F. Supp. at 1479.*

[*30]

Because "prompt incorporation" of all public information into a stock's price is "the foundation for the fraud-on-the-market doctrine," the doctrine necessarily supports a "truth-on-the-market" defense. E.g., *Wielgos, 892 F.2d at 516*. If the allegedly withheld or misrepresented information has otherwise been supplied to the market and had its presumed effect on the market, then the alleged misrepresentation or omission in a particular public disclosure will not sustain a fraud-on-the-market claim. See *id.*; *In re Apple Computer Sec. Litig., supra* (allegedly undisclosed information had credibly entered the market through computer trade publications); *Rodman v. Grant Foundation, 608 F.2d 64, 70 (2d Cir. 1979)* (adequacy of disclosure is judged in the context of "information already in the public domain and facts known or reasonably available to the shareholders").

Scienter

Section 10(b) and Rule 10b-5 also require that the plaintiff establish scienter, which the Supreme Court has defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)*. [*31] In *Reiss v. Pan American World Airways, Inc., 711 F.2d 11, 14 (2d Cir. 1983)*, the Second Circuit stated that "to prove scienter, more than a conscious failure to disclose must be shown. Rather, there must be proof that the non-disclosure was intended to mislead."

Here, it is undisputed that Aetna's annual reports to shareholders as well as its SEC filings did not contain specific information concerning Aetna's problem mortgage loans, restructured loans, or real estate acquired through foreclosure. However, it is also not disputed that Aetna's annual financial statements filed with the Connecticut Insurance Department included schedules which listed: 1) each real property valued over $ 100,000, including which were obtained through foreclosure; 2) each performing mortgage over $ 1,000,000; 3) each mortgage loan over $ 100,000 which was overdue for more than three months; 4) each mortgage on a property in the process of foreclosure or voluntary conveyance to the company; and (5) each mortgage recently transferred to real estate due to foreclosure or voluntary conveyance. It is further undisputed that Aetna's annual statements to the CID were public documents, [*32] available for public inspection at the CID in Hartford, and that Aetna mailed these annual statements to at least 250 rating agencies, market analysts, institutional investors and other market professionals. As to restructured loans, Aetna has presented evidence, which the plaintiff does not contradict, that Aetna disclosed detailed information concerning the amount of restructured loans to market professionals. The market professionals, in turn, published this information in their reports. n17 Further, the plaintiff admits that Aetna's CID filings included information on "problem loans, foreclosed properties, and restructured loans." Nonetheless, the plaintiff argues that it is "silly" to allow these state public filings and other disclosures to constitute public information that the market is presumed to have processed in arriving at a price for Aetna stock. The court disagrees.

Case 3:01-cv-01434-CFD    Document 116-2    Filed 05/25/2004    Page 5 of 17

Page 9
1994 U.S. Dist. LEXIS 15559, *

n17 See Moody's Insurance Credit Report on Aetna Life Insurance Company, October 1989, at 8 (discussing Aetna's $ 400 million of restructured loans) (exh. 5 in appendix to Aetna's motion for summary judgment, vol. IV); Anthony, D., Insurance Investor's Weekly-Industry Report, Dec. 26, 1989, at 4 (disclosing Aetna's restructured loans and comparing to other insurance companies) (exh. 6 in appendix, vol. IV).

[*33]

The plaintiff relies on the fraud on the market theory in order to sustain this cause of action. That theory holds that the market has processed all public information in arriving at the market price for securities. Accordingly, when allegedly undisclosed material information has credibly reached the market, the market is presumed to have taken the information into account. See *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("The presumption that the market price has internalized all publicly available information cuts both ways."). Here, the court concludes that the information concerning Aetna's problem loans, restructured loans, and real estate assets acquired through foreclosure credibly reached the market through Aetna's public filings with the CID. E.g., *Ferber*, 802 F. Supp. at 705-06 (counting the defendant Traveler's annual financial statements to the CID among its "public disclosures"); see *In re Apple Computer, supra*, at 1115. The court further finds that additional information concerning these topics, including specific information regarding restructured loans, [*34] credibly reached the market through Aetna's disclosures to market professionals, as evidence by their reports. See, e.g., *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991) (reports of securities analysts demonstrate that certain information is known to the market). The plaintiff offers no legal support for his contention that Aetna's CID filings and disclosures to market professionals should not constitute public information that was processed by the market. n18

n18 In fact, the plaintiff's entire discussion of materiality as to these alleged nondisclosures completely ignores both: 1) the "total mix" standard of materiality; and 2) the fraud-on-the-market context of this action.

Because there is no dispute of fact that the allegedly undisclosed information was available to the market, these alleged nondisclosures cannot provide the basis for the plaintiff's fraud-on-the-market claim. Accordingly, as a matter of law, the plaintiff has failed to present any evidence [*35] from which a reasonable finder of fact could find materiality or reliance, and Aetna's motion for summary judgment is granted as to these claims.

The plaintiff's assertion that materiality is a question of fact that must be reserved for the jury does not alter this result. In *Mendell v. Greenberg*, 927 F.2d 667 (2d Cir. 1991), the Second Circuit reversed the district court's decision granting summary judgment for the defendant as to the materiality of allegedly undisclosed information, and warned against determining materiality upon summary judgment: "Only when the proxy statement fully and fairly furnishes all the objective material facts as to enable a reasonably prudent stockholder to make an informed investment decision is the federal purpose in the securities laws preserved." *Id. at 674*. However, the materiality determination in Mendell did not address the effect of information made available to the public, i.e., whether allegedly undisclosed information had credibly entered the market; nor did it involve a fraud-on-the-market claim. n19 Likewise, the plaintiff's argument concerning materiality of these alleged nondisclosures [*36] completely ignores both the case law concerning information otherwise available to the market and the fraud-on-the-market context of this case. In light of the legal standards of materiality and reliance, discussed supra, the plaintiff's claim fails as a matter of law. n20

n19 The undisclosed information in Mendell--the majority Stockholder's estate tax liability--was not otherwise available to Shareholders when they considered their proxy solicitation.

n20 The court also concludes that, as to these three alleged nondisclosures, the plaintiff fails as a matter of law to establish scienter. Because the allegedly undisclosed information was disclosed in state public filings and mailed to numerous market professionals, no reasonable juror could conclude that Aetna acted with the requisite intent to deceive. See *Kramer v. Time-Warner, Inc.*, 937 F.2d 767, 778 (finding no "hint of any intent to deceive" in light of the defendant's public disclosures); *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1520 (N.D. Cal. 1990)("defendant's provision of adverse information to the securities analysts negates an inference that the company acted with an intend [sic] to defraud"); *Ferber*, 802 F. Supp. at 706 (the defendant's CID filings contained the

allegedly undisclosed information, and therefore, the plaintiff had failed to plead scienter); *Crystal v. Foy, 562 F. Supp. 422, 427 (S.D.N.Y. 1983)* ("the very document [plaintiff] relies upon negates the charge of fraud").

[*37]

B. Issues (iv), (v), and (vi): Applicable Law Regarding Misstatements and Omissions; Claims of Corporate Mismanagement

Aetna's Appraisal and Valuation of Real Estate

Aetna asserts that, as a matter of law, its failure to conduct independent appraisals of the properties underlying its commercial mortgage loans and its alleged "failure to value real estate conservatively" cannot serve as the basis for the plaintiff's securities fraud action. Aetna acknowledges that the so-called "outside" appraisals of real estate underlying its mortgage loans were: 1) made by the mortgage banking correspondent recommending the loan to Aetna, or by a third party appraiser at the correspondent's instruction; or 2) made by a third party appraiser if the loan was not originated through a correspondent. Aetna further recognizes that it did not describe its appraisal methodology or the identity of its appraisers in its public disclosures. Likewise, there is no dispute of fact that Aetna utilized the "discounted cash-flow method" of valuing commercial properties in its investment portfolio. Aetna asserts that, as a matter of law, these facts do not support the plaintiff's claim because the securities [*38] laws do not require Aetna to disclose this information. Absent a duty to disclose the information, Aetna argues, its failure to disclose is not actionable under Rule 10b-5. Aetna further contends that these two allegations constitute only claims of corporate mismanagement, which are not actionable under federal securities law.

The plaintiff, in response, contends that mortgage "correspondents," because they stand to receive commissions if Aetna approves their mortgage loans, suffer an inherent conflict of interest with Aetna, and, therefore, Aetna cannot reasonably rely upon appraisals provided by correspondents. The plaintiff asserts that the majority of Aetna's commercial loans were secured by real estate that "had never been appraised by an independent outside appraiser," and that Aetna never disclosed this fact to its shareholders. The plaintiff argues that Aetna's omission of this fact from its public disclosures was material because a reasonable investor would have found it significant in determining whether to buy or sell Aetna stock. Further, the plaintiff contends that Aetna's use of the discount cash-flow method of valuing real estate renders false the public statement of [*39] an Aetna official that, "Aetna's mortgage portfolio has consistently been underwritten on a conservative basis."

As to these claims, the court concludes that the plaintiff has failed to present evidence to support its allegation that Aetna made a false statement or omission, and that, at most, the plaintiff's allegations concerning Aetna's appraisals and valuation of real estate constitute a claim of corporate mismanagement, which is not actionable under the securities laws.

In *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977)*, the Supreme Court made clear that the scope of conduct prohibited by Section 10(b) of the 1934 Securities Act was limited to deceptive and manipulative acts, and that the Act's purpose was to implement a philosophy of "full and fair disclosure." *Id.* at 477, 478. Actions concerning "no more than internal corporate mismanagement" are not within the purview of Section 10(b) and Rule 10b-5. See *id.* at 479. "The purpose of the antifraud provisions [*40] (§ 10(b) or Rule 10b-5) is disclosure, not substantive review by federal courts of corporate affairs." *Kramer v. Time-Warner, Inc., 937 F.2d 767, 776 (2d Cir. 1991)*. Further, "the disclosure required ... is not a rite of confession. ... What is required is the disclosure of material objective factual matters." *Data Probe Acquisition Corp. v. Datatab, 722 F.2d 1, 5-6 (2d Cir. 1983), cert. denied, 465 U.S. 1052, 79 L. Ed. 2d 722, 104 S. Ct. 1326 (1984)*. The securities laws do not impose liability based on a failure to disclose information unless the defendant was obligated to do so: "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)*; see *Chiarella v. United States, 445 U.S. 222, 235, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980)*.

Here, the plaintiff cites no statute, regulation, or case law to support his contention that Aetna was required [*41] to disclose its appraisal procedures or valuation method to its shareholders and the SEC in its annual statements. The SEC required Aetna to disclose the value of its mortgage loan and real estate assets, see SEC Form 10-K, which Aetna did. The SEC did not require that Aetna, nor any other stock issuer, disclose its appraisal procedure or valuation method.

Of course, the issuer of stock owes a duty to disclose information if the omission of that information from public statements renders those statements misleading. E.g., Rule 10b-5. However, in addition to his failure to identify a duty in Aetna to disclose its procedures, the plaintiff presents no evidence that Aetna's appraisal or valuation practices undermined the accuracy of Aetna's disclosures concerning the value of its mortgage loan and

real estate investments. n21 Instead, the plaintiff points to the mortgage correspondent's "inherent" conflict of interest, and relies on a general assumption that formal "independent" appraisals are necessary to the valuation of every loan.

n21 Aetna has provided deposition testimony and affidavits concerning both: (1) the common practice of having correspondents provide appraisals for mortgage loans, and the appropriateness thereof; and (2) the discounted cash-flow method of valuing real estate in Aetna's portfolio, and why that is the appropriate method of valuation. The plaintiff has not submitted evidence to the contrary.

The fact that correspondents providing real estate appraisals is common practice in the commercial mortgage loan market is relevant because the plaintiff pursues a fraud on the market theory. If the market analysts and the trading public were aware of the practice, then this claim lacks the essential elements of materiality and reliance, and cannot support the plaintiff's securities fraud action.

[*42]

In *Ferber, 802 F. Supp. at 706*, the court dismissed a similar claim alleging that Travelers had "current" appraisals for only 27% of its mortgage loans and that Travelers used "in-house" appraisers rather than independent third-party appraisers. Although the plaintiff in this case had an opportunity to conduct discovery, he, similar to the plaintiff in Ferber, n22 has failed to establish any evidence that Aetna's appraisal practice undermined the accuracy of Aetna's public disclosures. Thus, the plaintiff has failed to establish a material misrepresentation n23 or omission by Aetna, and these claims fail as a matter of law. See *Basic, Inc., supra, at 239 n.17.* (absent duty to disclose, nondisclosure is not actionable).

n22 Ferber involved a motion to dismiss, however, the court stated that the alleged failure to disclose information about appraisals on mortgage loan properties could not constitute a Rule 10b-5 violation absent allegations as to how the defendant's appraisal practice undermined the accuracy of the defendant's disclosures regarding its portfolio. Ferber, 802 Supp. at 706. [*43]

n23 The plaintiff contends that because Aetna used a discounted cash-flow method of valuing commercial property, which was not the "most conservative" method of valuation, the statement of an Aetna official that "Aetna's mortgage portfolio has consistently been underwritten on a conservative basis," was false and misleading. The plaintiff has failed to contradict evidence that the discounted cash-flow method was the appropriate method of valuation. Uncontradicted evidence that Aetna, on average, sold its foreclosed properties for more than the written down values at which they were carried pursuant to Aetna's evaluations supports the statement that Aetna underwrites its mortgage portfolio on a "conservative" basis. The plaintiff has failed to provide any evidence to support his claim that the Aetna official's statement was misleading. Accordingly, summary judgment is granted to Aetna as to this alleged misrepresentation.

The court further concludes that these claims are properly characterized as claims alleging corporate mismanagement, and therefore, are not actionable under Rule 10b-5. In essence, [*44] the plaintiff challenges not a misrepresentation or omission by Aetna but Aetna's policies of using the discounted cash flow method of valuation and accepting appraisals from other than "independent" appraisers. Thus, the plaintiff challenges Aetna's internal management policies. In order to avoid "federalizing" the state common law of corporations and fiduciary obligations, the Supreme Court and the Second Circuit have countenanced against "bootstrapping" corporate mismanagement claims into federal securities law claims by alleging nondisclosure of the challenged practices. See, e.g., *Field v. Trump, 850 F.2d 938, 947 (2d Cir. 1988)*, cert. denied, *489 U.S. 1012, 103 L. Ed. 2d 185, 109 S. Ct. 1122 (1989); Sante Fe, 430 U.S. at 479*. Here, the plaintiff asserts that Aetna's appraisal practices and valuation methodology, as well as Aetna's nondisclosure of those policies in their reports to shareholders, violate the federal securities laws. The court concludes that the plaintiff's claim constitutes a claim of corporate mismanagement, [*45] not actionable under the securities laws. See *Kramer, 937 F.2d at 776* (when defendant disclosed that immediately prior to merger, merger consideration would be adjusted, plaintiff could challenge the legality of such adjustment only under state law); *Field, supra, at 946* (securities claim cannot be based on failure to disclose a breach of fiduciary duty); cf. Ferber, supra; *Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991)*, aff'd, *956 F.2d 1161 (2d Cir. 1992)*.

Case 3:01-cv-01434-CFD    Document 116-2    Filed 05/25/2004    Page 8 of 17

Page 12
1994 U.S. Dist. LEXIS 15559, *

Failure to disclose information concerning nonamortizing loans

The plaintiff claims that a large portion of Aetna's mortgage loan portfolio consisted of so-called "bullet" loans with low or no amortization; that when such loans came due during the class period, over half of them were restructured or foreclosed; and that Aetna's failure to disclose the existence of their nonamortizing loans to shareholders constituted an omission of a material fact.

In its motion for summary judgment, Aetna asserts that this alleged nondisclosure fails as a matter of law to support the plaintiff's action for [*46] securities fraud. Aetna acknowledges that a substantial part of its mortgage loan portfolio consisted of "five, seven and ten year loans with little or, in [some cases], no amortization," and that Aetna did not disclose the amortization terms of its mortgage loans in its annual or quarterly reports. Aetna asserts that the securities laws do not require it to disclose the existence of nonamortizing loans in its portfolio because the market was well aware of this general information. Absent a duty to disclose, Aetna contends that this alleged nondisclosure cannot support the plaintiff's claim.

The plaintiff, in response, argues that Aetna was required to disclose the large number of its nonamortizing loans, because it constituted firm-specific information material to shareholders. The plaintiff asserts that, because such a large percentage of nonamortizing loans were not paid in accordance with their terms, information concerning the loans and the risks they posed to the investment portfolio was material. The plaintiff further asserts that the Kearney report, which recommended that "the practice of primarily underwriting bullet loans should be reexamined," provides evidence of the importance [*47] of the amount of nonamortizing loans held by Aetna.

The securities laws do not require disclosure of general information of which the investing public is aware. E.g., *In re Trump Casino Sec. Litig., 793 F. Supp. 543, 562 (D.N.J. 1992)*, aff'd *7 F.3d 357 (3d Cir. 1993)*, cert. denied *114 S. Ct. 1219 (1994)*. "There is no obligation under the securities laws ... to set forth information which is public and which a reasonable investor ought to be held accountable for knowing." Id. (no duty to disclose recessionary downturn in the regional economy). Issuers of stock must disclose "firm-specific information; investors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a whole to produce a value for stock." *Wielgos, 892 F.2d at 515*. Issuers are not required to disclose "the hazards of its business, hazards apparent to all serious observers and most casual ones." Id. (no duty to disclose regulatory conditions, including the possibility that a project could be denied approval by the government); [*48] see *Hanon v. DataProducts Corp., 976 F.2d 497, 505 (9th Cir. 1992)*.

Here, it is undisputed that a substantial part of Aetna's mortgage loan portfolio was comprised of nonamortizing loans, and that the amortization terms of the loans were not disclosed in Aetna's reports to the SEC and shareholders. However, Aetna submits evidence that the investment community was well aware of the existence of nonamortizing loans in the commercial mortgage loan market, and asserts that the practice of providing such loans was common knowledge. n24 The plaintiff does not dispute that evidence. The court concludes that the reasonable investor was aware of the existence of nonamortizing loans in the commercial mortgage loan market during the class period, and, accordingly, Aetna had no duty to disclose this general information, i.e., the existence of nonamortizing loans in its portfolio. n25 Cf. *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124*, slip op. at 4416-18 (2d Cir. 1994) (dismissing, for lack of scienter, claim alleging that defendants failed to disclose the hazards of its "shared appreciation loans"); *Ferber, 802 F. Supp. at 709* [*49] (dismissing complaint alleging that a portion of mortgage loan portfolio was structured so that payment of interest rates was contingent upon escalating rents; plaintiff failed to allege that such structure was riskier than fixed rate mortgages).

n24 See, e.g., Deposition of James Richmond, at 440-443 (explaining the rise of "bullet" loans and their prevalence in the commercial mortgage loan market).

For instance, the Kearney report, upon which the plaintiff often relies, recommended that the practice of "primarily underwriting bullet loans should be reexamined." However, the report then stated: "However, in examining this issue, it is important to keep in mind that at present bullet loans have become the standard method of providing real estate marketing. Therefore, a decision not to accept any refinancing risk would be tantamount to withdrawing from the commercial mortgage loan market." Kearney Report, December 14, 1990, at 29.

n25 Additionally, to the extent that the plaintiff challenges Aetna's practice of offering nonamortizing loans, such claim constitutes an allegation of corporate mismanagement, not actionable under the federal securities laws. See supra. Further, to the extent that the plaintiff relies on evidence that Aetna disclosed its

restructuring of nonamortizing loans in its 1990 annual report to support the plaintiff's claim of nondisclosure in 1988-89, he engages in fraud by hindsight. See infra § B.2.

[*50]

The plaintiff, however, argues that Aetna's duty to disclose the nonamortizing loans arose due to the large amount of these loans in Aetna's portfolio and their poor performance. Because at least $ 1.8 billion of Aetna's nonamortizing loans came due during 1988 and 1989, and over half were not paid in accordance with their terms when they came due, the plaintiff asserts that the information was material and had to be disclosed to shareholders.

Although the fact of the amount of Aetna's nonamortizing loans when coupled with the restructure/foreclosure rate of those loans differs in nature from the fact that Aetna's investment portfolio simply included nonamortizing loans, n26 the plaintiff's claim still fails as a matter of law. The court concluded, supra, that Aetna was not required, in general, to disclose the amortization terms of its mortgage loans. When certain mortgage loans are restructured or foreclosed upon, however, that information arguably is material to shareholders, as it may affect the accuracy of Aetna's disclosures regarding its investment portfolio. Here, however, Aetna disclosed to the public and the market information concerning loans, including nonamortizing [*51] loans, that were non-performing, restructured, or in foreclosure. See supra, at 24 (no dispute of fact that Aetna's state filings and disclosures to market professionals included information concerning foreclosures, problem mortgage loans and restructured loans). Therefore, to the extent that Aetna was required to disclose information when nonamortizing loans were restructured or foreclosed upon, Aetna did, in fact, disclose this information. Accordingly, as a matter of law, the plaintiff cannot prove that the allegedly undisclosed information would have altered the "total mix" of information available, nor can the plaintiff establish reliance under the fraud-on-the-market theory. n27

  n26 Arguably, however, even information concerning the rate of foreclosure/restructuring of Aetna's nonamortizing loans would only be firm-specific if Aetna's problems with nonamortizing loans differed from the general experience of the industry. In *Wielgos, 892 F.2d 509*, the Seventh Circuit discussed whether Commonwealth Edison was required to disclose that its time and cost estimates as to constructing a nuclear reactor were consistently low and routinely increased. The court determined that this alleged nondisclosure was common knowledge to investors:

  "If Commonwealth Edison were doing significantly and unexpectedly worse than the industry as a whole--in completing their reactors or in making estimates about their costs--that might signal the presence of important, firm-specific information that it would have to reveal. Wielgos does not contend that either the estimates or the performance of Commonwealth Edison fall substantially below the norms of the industry." *Id. at 515.*

  Pursuant to Wielgos, the plaintiff's claim based in nondisclosure of nonamortizing loans fails as a matter of law. The existence of nonamortizing mortgage loans in Aetna's portfolio was general information known to the investment community; and the plaintiff does not allege, nor present evidence, that Aetna's rate of foreclosure or restructuring such loans was substantially worse than the rest of the mortgage loan industry. Accordingly, the alleged nondisclosure remains general, rather than firm-specific, information, which Aetna had no duty to disclose. [*52]

  n27 Likewise, because Aetna disclosed information concerning the restructure or foreclosure of nonamortizing loans when it occurred, the plaintiff has failed to present evidence from which a reasonable jury could find scienter. See, e.g., fn.20 supra, and cases cited therein.

C. Issues (vii) and (viii): Fraud By Hindsight

Two of the plaintiff's purported issues of fact concern the plaintiff's attack upon Aetna's system for setting loan loss reserves. Specifically, the plaintiff claims that: 1) Aetna's reported allowances for loan loss reserves, prior to 1991, were inadequate (and therefore Aetna's representations that its investment portfolio was closely monitored was false and misleading); and 2) by using an "historical formula" to set loan loss reserves, Aetna failed to set reserves on a reasonable basis (and never disclosed to shareholders its use of the "historical" formula).

Aetna asserts that these claims fail as a matter of law because the securities laws do not permit proof of fraud

Case 3:01-cv-01434-CFD    Document 116-2    Filed 05/25/2004    Page 10 of 17

Page 14
1994 U.S. Dist. LEXIS 15559, *

by hindsight. Aetna contends that the plaintiff attempts to prove the inadequacy of Aetna's loan [*53] loss reserves for 1988 and 1989 through evidence that Aetna increased these reserves in 1990, and that such evidence is insufficient as a matter of law. Aetna further contends that the plaintiff's claim that Aetna made misrepresentations regarding its reserves in 1989 and 1990 is not supported by the fact that in 1990 Aetna commissioned a study to examine its procedures for setting loan loss reserves.

The plaintiff, in response, relies on evidence of: 1) Aetna's increase of loan loss reserves in 1990; and 2) the so-called "Kearney Report," in which Aetna management examined its system for setting loan loss reserves. The plaintiff contends that the Kearney Report demonstrates that, in fact, Aetna "had no methodology in place during [1988 and 1989] to determine 'the potential loss exposure of the commercial mortgage loan portfolio.'" Plaintiff's memorandum in opposition, at 25. Therefore, the plaintiff argues, the Kearney Report provides factual support for his claim that Aetna's loan loss reserves had no reasonable basis and were inadequate, and that Aetna knew this. The plaintiff further contends that the Kearney Report also demonstrates that Aetna's "historical" formula for setting [*54] loan loss reserves was "totally unrealistic."

Numerous cases make clear that a plaintiff may not prove securities fraud by hindsight. E.g., *Shields v. Citytrust Bancorp, Inc., supra; Denny v. Barber, 576 F.2d 465 (2d Cir. 1978)*. In Denny, the Second Circuit, in affirming dismissal of a complaint, stated: "In sum, the complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones. While greater clairvoyance in 1973 might have led to a realization that [certain events would occur], failure to make such perceptions does not constitute fraud." *Id. at 470*. See also *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561, 566-67 (9th Cir. 1985); In re First Chicago Corp. Sec. Litig., 769 F. Supp. 1444, 1454 (N.D. Ill. 1991); In re Ramada Inns Sec. Litig., 550 F. Supp. 1127, 1132 (D. Del. 1982); Goldman v. Singer Co., 89 F.R.D. 436, 439-40 (S.D.N.Y. 1981)*. [*55]

The Second Circuit's recent decision in Shields v. Citytrust Bancorp, Inc. is instructive as to the prohibition on fraud by hindsight in the context of allegations of inadequate loan loss reserves. In Shields, the plaintiff alleged that Citytrust had publicly expressed confidence in the adequacy of its reserves for bad loans, even though Citytrust: 1) "knew or were reckless in not knowing" that the loan loss reserve was inadequate; 2) "knew but concealed" the poor condition of Citytrust's loan portfolio; and 3) "'knew or should have known' that Citytrust's loan problems were growing worse and that the loan loss reserve would have to be increased." *Shields, supra*, slip op. at 4417. In affirming the district court's ruling dismissing the complaint for failure to plead scienter with particularity, the court stated:

Shields records statements by defendants predicting a prosperous future and holds them up against the backdrop of what actually transpired. In April 1989, for example, Taylor announced that Citytrust was expecting that year to be its twelfth consecutive year of record earnings. Then, two months later, Citytrust announced that it would instead report a loss [*56] for 1989 as a result of its increase in its loan loss reserve. Similarly, Shields claims that Citytrust filed a document in August 1989 stating that it believed its loan loss reserve was adequate. Yet the following October it turned out that the reserve was inadequate and that Citytrust would make a significant addition to it. This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of "alleging fraud by hindsight."

Id. at 4418, quoting *Denny, 576 F.2d at 470*.

Similar to Shields, the plaintiff here claims that Aetna's 1988-89 loan loss reserves were inadequate, and that Aetna knew or should have known this, because the downturn in the real estate market rendered Aetna's "historical" formula "totally unrealistic." Unlike the plaintiff in Shields, however, the plaintiff here was permitted discovery on his claim of inadequate loan loss reserves, and points to the Kearney study as evidence of Aetna's false statement and scienter. This argument, however, relies on a mischaracterization of the Kearney report. [*57]

The undisputed facts in this action demonstrate that prior to and during the class period, Aetna maintained a system for monitoring its mortgage loan portfolio, primarily by monitoring restructured and "problem" loans, and establishing reserves if the loans were found to be "impaired." Pursuant to this system, on a quarterly basis Aetna established specific reserves designed to account for the probable impairment of mortgage loans. Aetna also established general loan loss reserves designed to provide for predicted loan losses beyond the specific loan reserves. This reserve was calculated using a formula based upon Aetna's historical record for loan losses. In late 1989, Aetna's management commissioned the Kearney report to examine: 1) alternative economic scenarios and the effects they might have on the portfolio; 2) ways to assess the risk on a prospective basis not dependent on past experience being

Case 3:01-cv-01434-CFD    Document 116-2    Filed 05/25/2004    Page 11 of 17

Page 15
1994 U.S. Dist. LEXIS 15559, *

extrapolated forward, i.e., alternatives to the "historical" formula; and 3) the desirability of adding some amounts to the general reserve not shown to be necessary under the existing formula. Contrary to the plaintiff's assertion, the Kearney report does not provide evidence that Aetna [*58] had no system for monitoring its portfolio and setting reserves.

The plaintiff, in essence, argues that Aetna's method for setting reserves was unreasonable; that the Kearney study's evaluation of Aetna's method of setting reserves should have been conducted earlier; and that Aetna's failure to do so resulted in inadequate reserves determined on an unreasonable basis. The plaintiff does not argue nor present evidence, however, that Aetna's disclosures were inconsistent with current data. See Shields, supra, at 4419. n28 Accordingly, the plaintiff's claim as to loan loss reserves fits squarely within Shield's prohibition on proof of fraud by hindsight, and fails as a matter of law.

  n28 In Shields, the court discussed the plaintiff's allegations that "in light of the risks which [Citytrust's] loan portfolio entailed," Citytrust knew or should have known that it would have to increase its reserves in the near future. The court stated: "These allegations do not say, however, that the company's disclosures were inconsistent with current data. The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud. People in charge of an enterprise are not required to take a gloomy, fearful, or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Shields, at 4419. Here, the plaintiff does not claim that Aetna misrepresented its data, but claims that the disclosures were inaccurate because of the method used to calculate the data. The latter claim does not support an action for violation of the securities laws.

[*59]

Further, to the extent that the plaintiff challenges Aetna's determination of the amount of loan loss reserves and Aetna's basis for its reserve calculation, he fails to state a cognizable action under the securities laws. See, e.g., *Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991), aff'd, 956 F.2d 1161 (2d Cir. 1992). In Ciresi, the court addressed a complaint alleging that the defendants improperly managed Citibank, "primarily by failing to establish adequate reserves while at the same time making additional loans of a high-risk nature," and therefore, the defendants' "representations to shareholders and to the investing public that the loan loss reserves were adequate and that the company in general was financially stable were false and misleading." *Id. at 821.* The court held: "The claim that the defendants did not plan their loan loss reserves properly is essentially a claim that defendants mismanaged the company. ... allegations of mismanagement are not actionable under section 10(b) of the securities laws. Id., citing *Sante Fe Industries*, 430 U.S. at 476; [*60] *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir. 1982).

As to his claims concerning Aetna's loan loss reserves, the plaintiff fails to present evidence from which a reasonable jury could find either a material misrepresentation or omission, or scienter. n29 Accordingly, Aetna's motion for summary judgment on these claims is granted.

  n29 Scienter can also be established by evidence of motive and opportunity to commit fraud. Shields, supra, at 4419 ("Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.").

  Here, the plaintiff generally asserts that Aetna's motive for the alleged misrepresentations concerning loss reserves was to maintain the highest bond rating possible from the rating agencies. However, Shields indicates that an alleged motive of an actor's general economic interest fails, as a matter of law, to support an inference of scienter: "In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic interest." Id. at 4420. The plaintiff's assertion that Aetna's chairman desired to maintain positive bond ratings constitutes an allegation of an obvious economic interest, rather than a specific motive to commit fraud. Cf. Shields (finding no scienter as a matter of law as to allegations that the defendants' motive for fraud was to inflate the price of their stock and to protect their executive positions and the compensation and prestige they thereby enjoy). Accordingly, no dispute of fact exists as to scienter.

[*61]

Case 3:01-cv-01434-CFD   Document 116-2   Filed 05/25/2004   Page 12 of 17

1994 U.S. Dist. LEXIS 15559, *                                    Page 16

### D. Issue (ix): Generally Accepted Accounting Principles and the Moore Affidavit

Although not included in the complaint, in his opposition to summary judgment the plaintiff claims that Aetna's 1988 and 1989 reports to shareholders violated Generally Accepted Accounting Principles (GAAP). In support of this purported issue of disputed fact, the plaintiff relies solely on the affidavit of Victor C. Moore ("Moore"), in which Moore expresses his expert opinion that Aetna violated GAAP by: 1) failing to obtain independent outside appraisals of the underlying property when a mortgage loan was restructured or foreclosed; and 2) failing to record known probable losses when such losses become probable and estimable.

Aetna asserts that the plaintiff has failed to present a genuine dispute of material fact as to compliance with GAAP, because the Moore affidavit presents evidence that is both inadmissible and insufficient, as a matter of law, to create a genuine dispute of fact. Aetna first moves to strike the Moore affidavit for the plaintiff's failure to comply with the court's scheduling order regarding disclosure and discovery of expert witnesses. Aetna further asserts that, even if the [*62] affidavit is not stricken, it does not create a dispute of fact pursuant to Fed.R.Civ.P. 56 because: 1) the affidavit does not constitute evidence admissible at trial; and 2) the affidavit is legally insufficient because it contains no factual information or analysis to support its conclusions.

The plaintiff, in response, contends that Moore is a qualified expert and, regardless of whether Moore will be permitted to testify at trial, his conclusions in the affidavit create a dispute of fact preventing summary judgment. The plaintiff contends that the affidavit is admissible evidence sufficient to defeat summary judgment.

The court disagrees. The court first notes that in its December 8, 1993 scheduling order (document no. 127), the court ruled that the plaintiff was to disclose required information concerning his expert witness, Dr. Pettit, and provided for Aetna's deposition of Dr. Pettit. The order further stated: "This order does not permit the plaintiff to designate expert witnesses other than Dr. Pettit, who was the only expert designated by the plaintiff on or before the July 15, 1993 deadline." Accordingly, absent a change in the scheduling order, Mr. Moore's expert opinion [*63] regarding compliance with GAAP would not be admissible at trial. However, the court need not rely on the scheduling order nor Aetna's motion to strike the affidavit in order to determine the motion for summary judgment. The Moore affidavit fails as a matter of law to create a genuine issue of disputed fact as to Aetna's compliance with GAAP.

Fed.R.Civ.P. 56(e), concerning the form of affidavits, states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." As to the requirement that facts be admissible in evidence, the expert opinion of Moore, who was not disclosed as an expert pursuant to Fed.R.Civ.P. 26(b)(4)(B), is not presently admissible at trial. See, e.g., *Penland v. Bic Corp., 796 F. Supp. 877, 881 (W.D.N.C. 1992)* (striking affidavits containing purported expert opinion not previously disclosed to defendant in contravention of court order). Accordingly, Moore's affidavit does not comply with Rule 56(e).

Further, courts may consider expert opinions on summary judgment [*64] motions "provided they meet the requirements of Rules 702 n30 and 703 n31 of the Federal Rules of Evidence." *Estate of Detwiler v. Offenbecher, 728 F. Supp. 103, 139 (S.D.N.Y. 1989)*. However, this practice is "not intended ... to make summary judgment impossible whenever a party has produced an expert to support its opinion." *Id. at 140* (quoting *Merit Motors, Inc. v. Chrysler Corp., 187 U.S. App. D.C. 11, 569 F.2d 666, 673 (D.C. Cir. 1977))*. Accordingly, "summary judgment is appropriate where the nonmoving party relies solely on an expert opinion that is not based upon specific facts, or that makes unsupported assumptions or ignores important facts." Id. (citing *United States v. Various Slot Machines on Guam, 658 F.2d 697, 700-01 (9th Cir. 1981); Merit Motors, 569 F.2d at 672-73)*. The Second Circuit has stated that a genuine issue of fact "cannot be established by mere speculation or idiosyncratic opinion, even if that opinion is held by one who qualifies as an expert under Fed. R. Evid. 702." [*65] *In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 187, 193 (2d Cir. 1987)*, cert. denied, *487 U.S. 1234 (1988)*. See also *Granoff v. Merrill Lynch & Co., Inc., 775 F. Supp. 621, 628 (S.D.N.Y. 1991)* ("Affidavits of an expert submitted on a motion for summary judgment of this type should show knowledge of the opposing contentions of fact developed during discovery and deal with those contentions."). Finally, expert affidavits opposing summary judgment must set forth "a reasoning beginning from a firm foundation." E.g., *Mid-State Fertilizer Co. v. Exchange Bank of Chicago, 877 F.2d 1333, 1338 (7th Cir. 1989)*.

---

n30 Fed.R.Evid. 702 provides: "If scientific, technical, or other Specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."

> n31 Fed.R.Evid. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

[*66]

Here, the Moore affidavit, in pertinent part, states:

> 2. .... The opinions expressed in this affidavit are based upon my experience as a CPA with substantial experience in banking and fiduciary matters and my review of the related information provided to me. ...
>
> 4. I have reviewed limited materials in this matter and my opinions are subject to modification based on subsequent data that may be provided. I have reviewed sufficient information to support the opinions rendered in accordance with the applicable professional standards.
>
> 5. In my opinion, [Aetna] did not comply with Financial Accounting Standards Board (FASB) statement no. 15, "Accounting for Debt Restructuring" by failing to obtain fair value appraisals on restructured loans and foreclosed real estate as clearly required by paragraph .124 of FASB no. 15.
>
> 6. In my opinion Aetna did not comply with The [SEC] Financial Reporting Release no. 28 (FRR 28), dated December 1, 1986 that was an interpretation issued by the SEC to "registrants engaged in lending activities". FRR 28 requires independent fair value appraisals to be obtained upon foreclosure as does FASB 15 ....
>
> 7. In my opinion, Aetna also failed to comply [*67] with FASB no. 5, which requires recordation of any known probable losses when such losses become probable and are estimable. Based on the lack of periodic reviews of asset values (prior testimony), the Kearney Report and the well known recession in the northeast, Aetna did not obtain sufficient evidence to enable the entity to comply with this financial reporting requirement of GAAP.

Affidavit of Victor C. Moore (document no. 153) (emphasis supplied).

The court concludes that the Moore affidavit is precisely the type of "expert" affidavit that courts have warned should not defeat summary judgment. See *Slot Machines*, 658 F.2d at 700 ("We have difficulty with the notion that to state an opinion is to set forth specific facts."). The affidavit states conclusions and references the accounting standards that were allegedly violated but fails to state the factual basis for the conclusions or provide any "process of reasoning." See *Mid-State Fertilizer*, 877 F.2d at 1338. Most troublesome, the affidavit fails to set forth the specific facts upon which the expert's opinion relies. See *Estate of Detwiler*, 728 F. Supp. at 140. [*68] The affiant states only that he has reviewed "limited materials in this matter" and "sufficient information to support the opinions."

Because the affidavit is "full of assertion but empty of facts and reasons," *Mid-State Fertilizer, supra, at 1339*, the plaintiff fails to present a genuine issue of fact as to Aetna's compliance with GAAP. Accordingly, Aetna's motion for summary judgment is granted as to this claim. n32

> n32 To the extent that the court must consider the factual weight of the Moore affidavit, see Mid-State Fertilizer, at 1339 ("An expert's declaration ... won't get a case past summary judgment, for the judge must 'look behind [the expert's] ultimate conclusion ... and analyze the adequacy of its foundation.'"), the court concludes that Aetna has sufficiently demonstrated that the factual foundation of Moore's conclusions, i.e., the accounting principles cited, fails to adequately support those conclusions. See Defendant's Reply Brief, at 11-14.

E. Issue (x): [*69] Spoliation of Evidence and the Adverse Inference

Aetna asserts that the plaintiff cannot avoid summary judgment by relying on his allegation that James Richmond, a former Aetna vice-president in charge of real estate investments, destroyed relevant evidence during the pendency of this action. Aetna acknowledges that, upon his retirement from Aetna in May 1991, James Richmond disposed of certain files while cleaning out his office. Aetna asserts that the plaintiff is not entitled to an adverse inference arising out of Richmond's destruction of evidence because the plaintiff has failed to identify any particular document, relevant to the action, that was destroyed. Further, Aetna contends that the plaintiff is not entitled to an adverse inference because he has not shown bad faith.

The plaintiff, in response, contends that he has presented evidence that James Richmond destroyed documents while this action was pending, and that this "spoliation evidence" entitles him to an adverse inference, which, by itself, precludes summary judgment

Case 3:01-cv-01434-CFD    Document 116-2    Filed 05/25/2004    Page 14 of 17

1994 U.S. Dist. LEXIS 15559, *                                              Page 18

for Aetna. The plaintiff also asserts that Richmond's destruction of evidence warrants additional sanctions against Aetna.

"That an adverse presumption [*70] may arise from the fact of missing evidence is a generally accepted principle of law that finds its roots in the 18th century case of [ *Armorie v. Delamirie, 1 Strange 505 (1722)]*." *Welsh v. United States, 844 F.2d 1239, 1246 (6th Cir. 1988)*. As the First Circuit stated in *Nation-wide Check v. Forest Hills Distributors, 692 F.2d 214 (1st Cir. 1982)*:

The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established. When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him. Wigmore has asserted that nonproduction is not merely "some" evidence, but is sufficient by itself to support an adverse inference even if no other evidence for the inference exists:

"The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable [*71] to the possessor, provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference." 2 Wigmore on Evidence § 291, at 228.

The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them.

*Id. at 217-218*. Whether a "defendant's actions may result or must result in an inference that the missing evidence would be unfavorable to the spoliator" depends upon a case-by-case analysis. *Welsh, 844 F.2d at 1247*.

Here, the evidence concerning destruction of documents is derived from the deposition testimony of James Richmond and his secretary, Ellen Herms. The evidence establishes that upon his departure from Aetna, Richmond cleared out his office and distributed some files to other Aetna employees, took some personal files home with him, and disposed of certain files into a dumpster which he had ordered to his office. According to Richmond's testimony, the files [*72] he threw away consisted of out-of-date files, none of which were Aetna files, largely consisting of "brochures or material that various real estate companies or vendors had left with [Richmond] over the years." The plaintiff has provided no contrary evidence as to the composition of the discarded files. n33

n33 The plaintiff points to the deposition testimony of Ellen Herms as evidence of the composition of the discarded files. However, Herms' testimony provided only speculation as to what types of files were discarded. Ms. Herms apparently did not witness the discarding of the files:
Q. Do you know what happened to Mr. Richmond's files?
A. The files that he had in his office?
Q. Yes.
A. I can tell you that when I went in to clean his office out after he had left, the files were not there.
Q. What happened to them?
A. I believe they were discarded.
Q. By whom?
A. I have no knowledge for sure, but I would say by him. I wouldn't think anyone else would have gone in and thrown them away.

Deposition of Ellen Herms, at 8.

She also stated, "There were a lot of files in that dumpster when I went in that morning." *Id.* at 9. Herms' deposition provides no evidence as to the composition of the discarded files, although the plaintiff points to her speculation that the amount of files in the quarter-full dumpster was "probably" equal to the amount of personal files Richmond kept in his office. *Id.* at 22. The plaintiff presents no evidence that the composition of Richmond's "personal" files differed from Richmond's account.

[*73]

Cases which apply the adverse inference arising from the destruction of evidence make clear that the party seeking the inference must identify relevant evidence that has been destroyed. *Nation-wide Check, supra, at 218*. Further, the party seeking the inference must introduce "some evidence tending to show" that the contents of "the document actually destroyed or withheld" support the inference sought. *Id.* For instance, in Nationwide Check, upon which the plaintiff relies, the district court applied the adverse inference following a party's destruction of specific evidence (checks) that was relevant to establishing the flow of money in disputed accounts. *Id. at 218-219*. The First Circuit held that the adverse inference was proper because the destroyed evidence, which was identified, was relevant. *Id. at 219*

("That the destruction was relevant is clear."). See also *Skeete v. McKinsey & Co., Inc.* 1993 WL 256659, *7 (S.D.N.Y. July 7, 1993) (holding that adverse inference was unwarranted because the "defendant has failed to demonstrate that the lost evidence bears some relation to [*74] the inference sought").

Here, the plaintiff identifies no relevant documents that were destroyed. Rather, he seeks a broad inference that, as a whole, the files which Richmond discarded must be presumed to have contained evidence that supports the plaintiff's claim for securities fraud. The adverse inference doctrine does not support this far-reaching proposition. See, e.g., *Skeete, supra*, at *7-8, and cases cited therein. The plaintiff cites no authority to the contrary. n34 The court concludes that the plaintiff has failed to identify relevant evidence that was destroyed, and therefore, is not entitled to an adverse inference that defeats summary judgment.

> n34 In each case cited by the plaintiff where the courts applied an adverse inference, the party seeking the inference identified a specific document or item of evidence that was destroyed or missing. See *Nation-wide Check, supra; Knightsbridge Marketing v. Promociones y Proyectos*, 728 F.2d 572 (1st Cir. 1984) (where defendant had admitted liability and damages trial was to determine lost commissions, court drew adverse inference against defendant for its failure to produce its earnings figures for the relevant years); *Mensch v. Bic Corp.*, 1992 WL 236965 (E.D. Pa. 1992) (denying adverse inference although plaintiff lost parts of allegedly defective lighter, because those parts were not at issue); *Martin v. Volkswagen of America, Inc.*, 1989 WL 81296 (E.D. Pa. 1989) (granting summary judgment for defendant where plaintiff alleged a defective accelerator but had sold the car); *Lee v. Boyle-Midway Household Prods., Inc.*, 792 F. Supp. 1001 (W.D. Pa. 1992) (plaintiff alleged defective drain cleaner but had lost the product container; summary judgment granted to defendant because identity of product was factual issue); *Roselli v. General Elec. Co.*, 410 Pa. Super. 223, 599 A.2d 685 (Pa. Super. 1991) (plaintiff alleged glass carafe on a coffee maker had exploded but failed to produce shards of glass for examination); *Friend v. Pep Boys*, 3 Phila. 363 (1979), appeal denied, 433 A.2d 539 (Pa. Super. 1981) (granting summary judgment to defendant where plaintiff alleged defective strap caused damages but had thrown away the strap). As these cases demonstrate, courts apply an adverse inference when destroyed evidence is identified, and there is a nexus between the missing evidence and a factual issue in the action.

[*75]

Further, the Second Circuit has instructed that the adverse inference does not operate to create evidence in the absence thereof; rather, it permits the fact finder to "give the strongest weight to the evidence already in the case in favor of [the party seeking the inference]." *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 923-24 n.7. In Stanojev, an age discrimination case, the court stated that an adverse inference could not serve to create a prima facie case of age discrimination where the plaintiff had adduced no other satisfactory evidence. Id. n.7. Discussing the jury charge on "records not produced at trial," the Second Circuit stated:

> If it were assumed that the other evidence was sufficient to make out a prima facie case, the jury could have been allowed to draw such an adverse inference. But that inference could not serve to supply the missing element of the prima facie case ....
>
> The charge was not helpful because it did not say what inference could be drawn. Considering what inference may be drawn in the analogous case of failure of a party to call a witness that would ordinarily be favorable to him, Judge Friendly made [*76] the perspicacious observation:
>
> "It would have been more accurate to characterize the inference ... as permitting the jury 'to give the strongest weight to the evidence already in the case in favor of the other side ....' The jury should not be encouraged to base its verdict on what it speculates the absent witnesses would have testified to, in the absence of some direct evidence."
>
> We do not believe that an inference that Stanojev was discharged on account of his age can logically be drawn from the failure of defendant to produce the management succession charts.

Id. (citations omitted). Similarly, because the court concluded supra that the plaintiff has failed, as a matter of law, to present evidence sufficient to support his claim of securities fraud, an adverse inference alone could not support a jury verdict for the plaintiff.

In addition, the Second Circuit has indicated that a party is not entitled to an adverse inference absent a showing of bad faith. See, e.g., *Berkovich v. Hicks*, 922 F.2d 1018, 1024 (2d Cir. 1991) ("On the facts of this case, 'one cannot justify the drawing of ... an [adverse] inference where the destruction [*77] of evidence was

unintentional.'")(quoting *INA Aviation Corp. v. United States, 468 F. Supp. 695, 700 (E.D.N.Y.), aff'd, 610 F.2d 806 (2d Cir. 1979))*. Aside from conclusory allegations that Richmond destroyed relevant files, which remain unsupported after considerable discovery, the plaintiff has provided no evidence of bad faith. Finally, to the extent the plaintiff requests that the court exercise its inherent authority to sanction Aetna for Richmond's destruction of files, the court declines to so exercise its discretion, as the plaintiff has not shown bad faith. See *United States v. International Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991)* (requiring a particularized showing of bad faith in order to justify the use of court's inherent powers), cert. denied, *480 U.S. 918 (1987)*.

For all these reasons, the evidence concerning the destruction of documents does not support an adverse inference sufficient to defeat Aetna's motion for summary judgment.

F. Other Causes of Action

For the reasons contained herein, the plaintiff's ten purported facts [*78] or issues of disputed fact, considered independently and in the aggregate, fail to present a genuine dispute of material fact as to the plaintiff's claim for securities fraud. Accordingly, Aetna's motion for summary judgment on count I, alleging violation of Sections 10(b), 20 and Rule 10b-5, is granted.

1. Section 20 "Controlling Persons" liability

Count II of the complaint alleges that James T. Lynn and Ronald E. Compton, Aetna's chief executive officer and president, respectively, are liable for securities fraud as "controlling persons" of Aetna pursuant to Section 20 of the Exchange Act. n35 "Controlling persons" liability requires that the plaintiff first establish proof of a securities violation by Aetna. See, e.g., *Ferber v. Travelers Corp., 785 F. Supp. 1101, 1111 (D. Conn.*

*1991)* ("claims for secondary liability must be dismissed when primary violation claims are dismissed"). Because the court concludes supra that the plaintiff has failed as a matter of law to establish proof of a securities law violation, the court dismisses the second count of the complaint.

n35 Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t.*

[*79]

2. State Common Law Causes of Action

Because the court grants Aetna's motion for summary judgment and dismisses the plaintiff's federal claims, it dismisses the plaintiff's state law claims in count III (common law fraud, deceit, and intentional misrepresentation) for lack of subject matter jurisdiction. See *United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-27, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).*

CONCLUSION

For the reasons contained herein, the defendant's motion for summary judgment is granted. The plaintiff's motion for partial summary judgment is denied. The complaint is dismissed.

It is so ordered, this 26th day of August, 1994.

Alfred V. Covello

United States District Judge

102F9M

********** Print Completed **********

Time of Request: February 07, 2003   12:28 PM EST

Print Number:    1861:0:79639121
Number of Lines: 1386
Number of Pages:

Send To: NGUYEN, ALEXANDER
         YALE LAW SCHOOL
         127 WALL ST
         NEW HAVEN, CONNECTICUT 06511-6636